United States District Court

Eastern District of Michigan

| | |
|---|---|
| Heather Kerchen, Lori Kerchen, and Dale Kerchen, | Case no: |
| Plaintiffs, | Hon. |
| vs. | |
| Christian Raphalides (in his individual and official capacities), | **COMPLAINT** |
| University of Michigan, James H. Woods (in his individual and official capacities), & Unknown Does (in their individual—and where appropriate—official capacities), | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**Dustyn Coontz**

Attorney for Heather Kerchen

1100 W. Saginaw St.

Suite 4A

Lansing, MI 48915

(517) 940-8004

dc@coontzlaw.com

**Timothy G. Lynch**

General Counsel for the

University of Michigan

1109 Geddes Avenue

Ruthven Bldg, Suite 2300

Ann Arbor, MI 48109

(734) 764-0305

timlynch@umich.edu

**JURISDICTION**

1. This Court has original jurisdiction because this case is brought, in part, under 42 U.S.C. § 1983 and alleges violations of the U.S. Constitution.

2. Under 28 U.S.C. § 1367, this Court also has supplemental jurisdiction for "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III."

3. Claims are "so related" when they "derive from a common nucleus of operative fact."[1]

4. This complaint also alleges violations of Michigan state law, but the facts supporting the state claims are the same facts supporting the federal claims.

5. In other words, the state and federal claims derive from a common nucleus of operative fact.

**VENUE**

---

[1] United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

6. Venue is proper both because at least one defendant resides in this District[2] and because the events "giving rise to the claim occurred" in this District.[3]

## PARTIES

7. Plaintiff Heather Kerchen appears individually and in her capacity as the personal representative of the estate of Todd Kerchen, and she resides at 1234 Hudson Dr. Howell, MI 48843.

8. Plaintiff Lori Kerchen appears individually and resides at 5746 E. Demeter Rd. Florence, AZ 85132.

9. Plaintiff Dale Kerchen appears individually and resides at 5746 E. Demeter Rd. Florence, AZ 85132.

10. Defendant Christian Raphalides is an individual who, upon information and belief, resides at 10 Setting Sun Tr. West Milford, NJ 07480-4157

---

[2] 28 U.S.C. § 1391(b)(1); see also 28 U.S.C. § 1391(c)(2).
[3] 28 U.S.C. § 1391(b)(2).

3

11. Defendant University of Michigan is a public higher-education institution with facilities throughout Ann Arbor, MI, and beyond.

12. Defendant James H. Woods is a professor emeritus of the University of Michigan's Department of Pharmacology; his personal address is unknown, but the Department of Pharmacology is located at 1150 W. Medical Center Dr. Ann Arbor, MI 48109-5632.

13. Defendants Unknown Does consist of either (1) individuals or institutions who are not yet known through Plaintiffs' investigation; or (2) individuals or institutions who are known, but whose tortious conduct cannot at this time be properly alleged.

14. Defendants Unknown Does are likely to be (1) current or former employees of the University of Michigan; (2) Washtenaw County; (3) current or former employees of the Washtenaw County Sheriff's Department; (4) the City of Ann Arbor; (5) current or former employees of the Ann Arbor Police Department; and (6) other

individuals who may have been involved in the death of Todd
Kerchen.

## STATEMENT OF FACTS

15. On January 25, 2000, Todd Kerchen[4] was found dead on the floor of
his home in Ypsilanti Township.

*The Scene*

16. The night before Todd's death, he and his girlfriend, Andrea Patti
(née DeCamp),[5] had gone out drinking, where they ran into Todd's
roommates, Jerid Shuryan and Justin Staffeld.

17. Shuryan and Staffeld got home around 10:45-11:15 pm the night of
January 24, and Todd and DeCamp arrived roughly half an hour later.

18. When Todd and DeCamp arrived on the main floor of the home,
Shuryan had already gone to the second floor to get ready for bed.

---

[4] The remainder of this complaint will refer to him as *Todd* to avoid confusion with the Plaintiffs;
likewise, the Plaintiffs will be referred to as *Heather*, *Lori*, and *Dale*.
[5] The remainder of this complaint will refer to her as *DeCamp*.

19. Staffeld stayed on the main floor with Todd and DeCamp for a short time but went to bed on the second floor around midnight.

20. After Staffeld went upstairs, Todd and DeCamp stayed up to drink a little bit more, and according to DeCamp, they both used a drug she initially called "Crystal China."

21. The two apparently went to sleep very soon after.

22. Around 7:15 am on January 25, Staffeld noticed that Todd and DeCamp appeared to be passed out on the main level.

23. DeCamp was slumped on the floor between the loveseat and the coffee table with her head resting on the loveseat.

24. Todd was found facedown between the coffee table and the TV.

25. He and Shuryan looked at the scene together, and Staffeld took photographs of the two.

26. Staffeld heard DeCamp snoring, and claimed to have been unsure whether Todd was also still breathing.

27. Shuryan recalled Staffeld telling him "at least they're both breathing."

28. Shuryan and Staffeld each left for work shortly after.

29. Sometime that morning, DeCamp awoke, still high, to find Todd still unconscious.

30. She tried to wake him, including by rolling him over, but couldn't.

31. She waited an hour to call 911.

32. She called not for police, but for an ambulance for a "sick person."

33. When Huron Valley Ambulance (HVA) arrived, HVA notified the Washtenaw County Sheriff's Department (WCSD)'s dispatch that they required police assistance.

34. Police arrived shortly before noon and immediately began treating the area as a crime scene.

35. Deputy Rob Pasternak noticed a glass vial with a white powdery substance in it on the coffee table near Todd's body.

36. Also on the table were a CD with a white powdery substance on top of it, a blade directly next to it, and a rubber stopper and aluminum cap that seemed to have come from the glass vial.

37. There was also a 3" straw, presumably used to snort the powdery substance.

38. Detectives John Scafasci and Cindy Squires collected and logged these items (and several other items) as evidence.

39. At the scene, both DeCamp and Todd were seen to have blood coming from their noses.

40. Medical Examiner Investigator Diana French arrived on scene at 1:10 pm and determined that death would have occurred 4-8 hours before she arrived.

41. If true, the earliest Todd would have been dead would have been 5:00 in the morning, well after DeCamp said they snorted the drugs.

*Todd's Autopsy*

42. After French conducted the medical examination, Todd's body was transported to the morgue at St. Joseph Mercy Hospital.

43. There, Dr. Bader J. Cassin, the forensic pathologist, performed the autopsy.

44. As part of the autopsy, Dr. Cassin collected both blood and urine specimens.

45. The initial toxicology screening showed only that Todd had a blood alcohol content of .085 and no other substances in his system.

46. But further testing showed the presence of fentanyl.

47. Even further tests performed at the Warde Medical Lab in Ann Arbor showed that Todd had a level of 27 nanograms of fentanyl per millileter of blood.

48. Not only was there a fatal dose of fentanyl in Todd's blood, but there was also no norfentanyl (the main metabolite of fentanyl) detected.

49. This means Todd died before his body had the ability to metabolize the fentanyl.

50. Dr. Cassin ultimately concluded that the cause of death was "drug and alcohol abuse," but the manner of death was undeterminable.

*The Interviews of Andrea DeCamp*

51. DeCamp was initially interviewed at the scene, where she was disoriented, lethargic, and easily confused.

52. Still, the police were able to divine the events of the prior evening.

53. Among the things she told Detective Rob Pasternak at the time were that she and Todd had done "Crystal China" and that Todd snorted it first.

54. She ended up being transported to St. Joseph's by HVA.

55. Deputy Mark Neumann rode with DeCamp, who was mostly unintelligible, but who did say she remembered "doing a *tiny tiny line* of White China."[6]

---

[6] Emphasis added.

56. After DeCamp arrived at St. Joseph's, she became more coherent.

57. Detective Beth Gieske arrived at the hospital and overheard DeCamp telling medical professionals that she did a "*teeny tiny line* of China White."[7]

58. Det. Gieske then interviewed DeCamp directly about the events of the previous night.

59. DeCamp claimed that when she and Todd had nothing left to drink that night, Todd retrieved some "China White" from an unknown location in the house.

60. DeCamp again claimed to have a "*teeny tiny line.*"[8]

61. DeCamp told Det. Gieske that she did not know where Todd got the drugs or whom he may have purchased them from.

62. DeCamp claimed never to have done this drug before but that Todd had told her he'd done it.

---

[7] Emphasis added.
[8] Emphasis added

63. On February 15, 2000, Det. Scafasci reinterviewed DeCamp over the phone.

64. She said she did not have much memory of her prior statements.

65. She told Det. Scafasci that she believed Todd would have received the drugs from Christian Raphalides.

66. DeCamp claimed that she and Todd would snort cocaine and heroin with Raphalides, who always had drugs on him.

67. She claimed that she and Todd stopped using drugs for a while and tried to convince Raphalides to do the same.

68. Eventually, DeCamp claimed, she and Todd stopped hanging out with Raphalides because Raphalides always wanted to do drugs.

69. DeCamp claimed that she and Todd stopped hanging around Raphalides shortly after his fraternity brother died of an overdose.

70. Upon information and belief, DeCamp never stopped associating with Raphalides.

71.  Upon information and belief, DeCamp and Raphalides maintain a

relationship to this day.

*The Killings of Christian Raphalides*

72.  Christian Raphalides was originally a student at the University of

Michigan.

73.  Upon information and belief, Raphalides began his studies at the

University in 1988 and graduated in 1993.

74.  Yet in September 1998, Raphalides had been friends with

Christopher Giacherio for over a year.

75. In September 1998, Giacherio was a sophomore at the University.

76.  Upon information and belief, the two of them met through the Zeta

Psi fraternity, despite Raphalides having graduated four years before

Giacherio began his studies.

77. Whatever the circumstances around their friendship, in the early morning hours of September 16, 1998, Giacherio came to Raphalides's apartment.

78. With them was Daniel Kruse.

79. The three men had been drinking and snorting cocaine.

80. In an attempt to "come down" from the cocaine, Raphalides produced "China White heroin" and provided some for everyone.

81. Raphalides cut a "much smaller line" for himself—perhaps a *teeny tiny line*.

82. Kruse and Raphalides awoke later the morning of September 16, 1998, to find Giacherio dead.

83. Raphalides tried to administer CPR and a substance he referred to as Nantraxel.

84. Upon information and belief, this substance was either a brand name for naloxone (currently branded as Narcan) or akin to it, in that it was to be administered to prevent an overdose of opiates.

85. On finding the body, Kruse left and told Raphalides "I was never here."

86. Raphalides destroyed evidence at the crime scene before calling 911.

87. Ann Arbor Police Department (AAPD) conducted an investigation into the death.

88. On October 29, 1998, AAPD Lt. Jim Tieman informed the Ann Arbor News that the cause of death was a cocaine overdose.

89. Upon information and belief, however, there was a lethal dose of fentanyl in Giacherio's system as well.

90. This is based on Giacherio snorting "China White" shortly before his death in the same way Todd snorted "Crystal China / White China / China White" shortly before his death.

91. Upon information and belief, either (1) fentanyl was not tested for because it was not as pervasive or well known a controlled substance in 1998 as it is in 2022, or (2) AAPD misled the press.

92. On January 22, 2000, (three days before Todd's death, as fate would have it), the Washtenaw County Prosecutor's Office (WCPO) declined to authorize charges against either Kruse or Raphalides.

*The University and Dr. Woods's Involvement*

93. Raphalides was not only a one-time student at the University, but he was also an employee until November 1999.

94. He worked in the pharmacology lab within the University of Michigan Medical School.

95. The primary purpose of the lab is to test the effects of controlled substances on animals for research purposes.

96. Dr. James H. Woods was the head of the lab at the time.

97. At the lab, Raphalides had access to numerous controlled substances, including pure, unadulterated fentanyl.

98. He had his own locker at the lab to store the controlled substances he was entrusted with.

99. As part of the investigation into Todd's death, Det. Scafasci interviewed Dr. Woods on two occasions: February 10, 2000, and March 6, 2000.

100. At the first interview, Dr. Woods did not have counsel present.

101. In that interview, Dr. Woods acknowledged that Raphalides would have access to the drugs used for animal testing, which includes fentanyl.

102. Dr. Woods also stated that Raphalides would have been able to remove controlled substances from the building in a glass vial with a rubber stopper with an aluminum clasp over the stopper.

103. This is exactly what was found on the coffee table of Todd's home.

104. Dr. Woods described the vial, stopper, and clasp without Det. Scafasci describing or showing it to him ahead of time.

105. At that point, Det. Scafasci showed a photo of the vial, stopper, and clasp, which Dr. Woods confirmed was exactly like what they used in the lab.

106. Dr. Woods also confirmed that the University had a unique method of labeling the aluminum clasps.

107. Dr. Woods stated that Raphalides would know how potent a drug fentanyl is because of his education and occupation.

108. Dr. Woods stated that the drugs in the lab are kept in a solution to administer to the animals.

109. Yet the fentanyl found at Todd's home was in a powder form, leading Dr. Woods to surmise that Raphalides would have evaporated or boiled the water from the solution.

110.   Upon information and belief, Det. Scafasci retrieved Raphalides's personnel file from the University's HR department after this interview.

111.   In the second interview, Dr. Woods had counsel present.

112.   This interview began with Dr. Woods explaining how controlled substances are logged in and out at the lab.

113.   The lab keeps *thousands* of different types of drugs for testing on animals.

114.   At the time, the drugs were kept in a safe that was locked for 22 hours of the day, and unlocked for one hour in the morning and one hour in the afternoon.

115.   When employees would need a new controlled substance, they would have to remove it from the safe during one of these one-hour blocks, weigh the controlled substances, and handwrite what drug they took and how much of it.

116.   Ordinarily, Dr. Woods or his secretary would oversee these one-hour blocks.

117.   But not always.

118.   Upon information and belief, there were no other procedures in place to ensure the drugs were administered properly or even stayed on premises.

119.   Upon information and belief, there was no regular inventorying of the substances that had been taken from the safe.

120.   Upon information and belief, there were no procedures reconciling the amount of drugs withdrawn from the safe with the amount and types used in the lab tests.

121.   Indeed, Dr. Woods also mentioned that employees at the lab had their own individual lockers, and that it would be "common" for the employees to keep the drugs in their lockers.

122. In addition to detailing lab procedures, Dr. Woods again confirmed that the vial, stopper, and clasp found at Todd's home would have originated from the lab.

123. But instead of showing a photo this time, Detectives Scafasci and Ralph showed him the actual, physical evidence checked out from the WCSD evidence room.

124. While Dr. Woods stated that these items were common in any research lab, he also again mentioned that there was a certain procedure unique to the University where the employee would write the drug, the date, and their initials on the aluminum clasp.

125. On the clasp found at Todd's home were the date *6-2-94*, the abbreviation of *Fent. 100.56mg*, and the initials *DJ*.

126. Those initials stand for David Jewett.

127. Jewett was a former employee at the lab.

128. He was originally Raphalides's supervisor, and when Jewett left the lab, Raphalides took over the project Jewett had been leading.

129. According to both Dr. Woods and Jewett, it would be common for employees to put drugs they checked out in someone else's locker if they were working on the same project.

130. After Dr. Woods identified the initials *DJ* belonging to Jewett, Dr. Woods pulled computer-generated logs of Raphalides and Jewett's history of checking out fentanyl.

131. According to the logs, on June 2, 1994, (i.e. *6-2-94*), David Jewett (i.e., *DJ*) logged out fentanyl (i.e., *Fent.*).

132. Curiously, the amount in the log was 100.4mg, which is .16mg less than the *100.56mg* written on the clasp.

133. Upon information and belief, there were no procedures in place to ensure that the amount logged was actually the amount withdrawn.

134.  This would make it much easier for someone to misappropriate the drugs at the lab, if they were so inclined.

135.  In this second interview, Dr. Woods also acknowledged that the lab received fentanyl in a powder form, which seems to contradict what he stated at his first interview (that it was kept in a solution).

136.  Dr. Woods stated that the fentanyl supply the lab had as of March 2000 was the same it would have had when Raphalides and Jewett worked at the lab.

137.  Dr. Woods spoke over the phone with Michigan State Police Forensic Scientist Doug Sund and confirmed that the fentanyl found in Todd's home had the same exact molecular structure as the fentanyl at the lab.

138.  Also during the interview, Dr. Woods showed Detectives Ralph and Scafasci to Raphalides's locker.

139.   In the locker were 28 vials of PCP, morphine, naltrexone, and a

handful of other drugs.

140.   Raphalides had been terminated from the lab almost four months

before this second interview.

141.   Yet no one at the lab had opened Raphalides's locker in that

four-month span.

142.   These drugs were virtually unaccounted for for four months.

143.   The fentanyl that killed Todd Kerchen was unaccounted for for

five-and-a-half years.

*The Follow-Up*

144.   Upon information and belief, the investigation stalled after the

second interview with Dr. Woods.

145.   WCSD Detectives indicated to both Heather Kerchen and Todd's

mother, Lori Kerchen,[9] that they were trying to locate Raphalides in

---

[9] The remainder of this complaint will refer to her as *Lori* to avoid confusion with the Plaintiff.

New Jersey, where he was supposed to have moved to after his termination at the lab.

146.  The Detectives supposedly tried for three months to locate Raphalides in New Jersey but didn't.

147.  Lori also spoke to Shuryan and Staffeld, who informed Lori that Raphalides kept trying to call Todd, apparently not knowing he died.

148.  According to Shuryan and Staffeld, the Detectives wanted to record Raphalides's calls.

149.  None of this is documented in the records Heather obtained through the Freedom of Information Act.

150.  Upon information and belief, the Detectives misled the Kerchens with their representations of the investigation.

151.  The Detectives did not inform the family of the conversations with Dr. Woods and the certainty that the fentanyl that killed Todd originated at the University.

152.   This all led Heather, Lori, and Todd's father, Dale, to believe Todd

had died of a run-of-the-mill overdose.

153.   Indeed, the family was led to believe the investigation had been

closed.

154.   But it wasn't until March 14, 2021, that the WCPO formally denied

charges against Raphalides.

155.   This only came to the attention of the WCPO because of the

investigation Heather did into her brother's death two decades after

the fact.

156.   She did this investigation not out of suspicion of police cover-up,

but as part of her PTSD therapy.

157.   Heather received the documents that give rise to these allegations

no earlier than October 19, 2020.

158.   What she found shocked her.

159.   The delay in the Estate of Todd Kerchen pursuing these claims is

attributable solely to the fact that Todd's family did not know, or have

reason to know, the extent of wrongdoing on Raphalides's part or the

presence of wrongdoing on the University and Dr. Woods's part.[10]

## CLAIMS

160.   The University of Michigan is a public university, meaning it is a

state actor.

161.   For most of the timeline relevant to this case, Christian Raphalides

was an employee of the University and at times acting under color of

the University's regulations and customs.

162.   For all times relevant to this case, Dr. James H. Woods was an

employee of the University and acting under color of the University's

regulations and customs.

---

[10] Plaintiffs expect all defendants to assert an affirmative defense that the statute of limitations has run. Plaintiffs are ready to meet those arguments but recognizes that this complaint is not the appropriate medium to do that. Still, it is worth asserting here why there is a lawsuit being filed in 2022 discussing events from 1994 and 2000.

163.   Heather Kerchen alleges the following claims against the

defendants:

*Count I: Deprivation of Life Without Due Process of Law*

164.   Heather Kerchen, in her capacity as personal representative of the

estate of Todd Kerchen, brings this claim.

165.   42 U.S.C. § 1983 allows U.S. citizens to bring suit against

government actors for violating constitutional rights.

166.   The Fourteenth Amendment requires that no State shall deprive

any person of life without due process of law.

167.   Substantive due process claims, like the deprivation of life, are

cognizable under § 1983.[11]

168.   A substantive due process claim can be made where government

conduct "shocks the conscience."[12]

---

[11] Zinermon v. Burch, 494 U.S. 113, 125 (1990).
[12] County of Sacramento v. Lewis, 523 U.S. 833 (1998).

28

169.   Here, all named defendants engaged in conduct that shocked the conscience.

170.   The fentanyl that killed Todd Kerchen can be traced directly to the University:

   a.   It came from a glass vial, rubber stopper, and aluminum clasp identical to those used by the lab;

   b.   It was labeled in a manner identical to the proprietary method the University uses;

   c.   The writing on the clasp indicated that someone with the initials *DJ* checked out 100.56 mg of "Fent." on 6-2-94;

   d.   Logs from the lab confirm that on June 2, 1994, David Jewett withdrew nearly that same exact quantity of fentanyl;

   e.   Jewett was both the supervisor to and predecessor of Raphalides;

   f.   Todd and DeCamp had connections with Raphalides; and

g. Dr. Woods confirmed with the Michigan State Police that the molecular structure of the fentanyl that killed Todd was identical to the molecular structure of the fentanyl at the lab.

171. Between 1994 and 1999, the University—under Dr. Woods's leadership—employed little more than The Honor System to ensure that fatal drugs stayed in the pharmacology lab and out of the streets of Ann Arbor.

172. The fentanyl that killed Todd, for instance, was logged out in June 1994, and it killed Todd in January 2000.

173. That same fentanyl was logged as different quantities in different places.

174. Dr. Woods or his secretary would only sometimes supervise other employees as they took drugs from the safe at the lab.

175. There was apparently no real procedure for ensuring that:

a.  The drugs were taken in the amount they were said to have been taken;

b.  The drugs were used for what the employee said they were using them for;

c.  The amount of drugs administered to the animals in different tests reconciled the amount of drugs withdrawn;

d.  The drugs would be returned if not used within a certain time;

e.  The drugs were kept in a centralized location; and

f.  At a minimum, the drugs stayed *in the lab*.

176.  Most of these drugs, if they find the streets in large enough quantities, can kill.

177.  Some, like fentanyl, can kill in very small doses.

178.  Such recklessness in dealing with drugs shocks the conscience.

179.  Each named defendant engaged in conscience-shocking behavior that directly led to Todd Kerchen's death:

a. The University, for its lax policies surrounding lethal controlled substances;

b. Dr. Woods, both in his individual and his official capacity, for his overseeing these policies; and

c. Raphalides, both in his individual and his official capacity, for exploiting these lax policies and delivering the fentanyl that killed Todd.

180. Each named defendant, then, is liable for this § 1983 claim.

*Count II: Wrongful Death*

181. Heather Kerchen, in her capacity as personal representative of the estate of Todd Kerchen, brings this claim.

182. Under MCL 600.2922, the personal representative of a decedent's estate may bring suit against any person or institution whose wrongful act, neglect, or fault caused the decedent's death.

183.   While an individual cannot sue the State of Michigan merely for

neglect or negligence, the State and its subdivisions and agencies can

be sued for gross negligence.[13]

184.   The same conduct constituting conscience-shocking behavior in

Count I also constitutes, at a minimum, gross negligence by each of

the named defendants.

*Count III: Drug Dealer Liability Act, Section 6*

185.   Heather Kerchen, in her capacity as personal representative of the

estate of Todd Kerchen, brings this claim.

186.   Under Michigan's Drug Dealer Liability Act (DDLA), a person can

recover "civil damages against persons who participate in illegal

marketing of controlled substances for injuries caused by illegal use

of controlled substances." MCL 691.1601.

187.   Under MCL 691.1604, a *person* can be an individual or a

governmental entity.

---

[13] MCL 691.1407(2)(c).

188.  To "participate in illegal marketing," is to manufacture, deliver, or possess with the intent to manufacture or deliver, or attempt or conspire to do any of these things, in violation of state or federal law. *Id*.

189.  Participation in illegal marketing does not require violation of state or federal *criminal* law. *See id*.

190.  Under MCL 691.1606 (i.e., Section 6), an individual abuser may bring an action "against a person who participated in illegal marketing of the controlled substance actually used by the individual abuser."

191.  An *individual abuser* is a person who uses an unprescribed or illegal controlled substance. MCL 691.1603.

192.  The *individual abuser* in this case is Todd Kerchen, who is dead.

193.  Heather Kerchen, as the personal representative of Todd's estate, stands in for him.

34

194.   Raphalides participated in illegal marketing of the fentanyl that killed Todd by illegally distributing it.

195.   Upon information and belief, Dr. Woods participated in illegal marketing of the fentanyl that killed Todd by manufacturing[14] it in a manner inconsistent with state and federal regulations.

196.   Upon information and belief, the University participated in illegal marketing of the fentanyl that killed Todd by manufacturing it in a manner inconsistent with state and federal regulations.

*Count IV: Drug Dealer Liability Act, Section 5 (Estate)*

197.   Heather Kerchen, in her capacity as personal representative of the estate of Todd Kerchen, brings this claim.

198.   Under MCL 691.1605 (i.e., Section 5), "a person injured by an individual abuser may bring an action . . . against a person who

---

[14] The DDLA does not define *manufacture*, but the Michigan Public Health Code does; Plaintiffs are relying on that definition.

35

participated in illegal marketing of the controlled substance actually used by the individual abuser."

199. Under this section, the *person injured by an individual abuser* can be the individual abuser himself.

200. This is because unlike in Section 7 of the DDLA, the language of Section 5 does not require the "person injured by an individual abuser" to be someone "[o]ther than an individual abuser."

201. By overdosing, Todd injured himself.

202. For the reasons stated in Count III, Raphalides, Dr. Woods, and the University participated in illegal marketing of the fentanyl that killed Todd.

*Count V: Drug Dealer Liability Act, Section 5 (The Family)*

203. Heather, Lori, and Dale Kerchen, in their individual capacities, bring this claim.

36

204.  Again, "a person injured by an individual abuser may bring an

action . . . against a person who participated in illegal marketing of

the controlled substance actually used by the individual abuser."

205.  Legal injuries—including emotional, psychological, and even

physical trauma—to Heather, Lori, and Dale were caused by Todd

overdosing.

206.  For the reasons stated in Count III, Raphalides, Dr. Woods, and

the University participated in illegal marketing of the fentanyl that

killed Todd.

*Count VI: Drug Dealer Liability Act, Section 7*

207.  Heather, Lori, and Dale Kerchen, in their individual capacities,

bring this claim.

208.  Under MCL 691.1607 (i.e., Section 7), "a person injured by an

individual abuser may bring an action for damages against a person

who participated in illegal marketing of the market area controlled substance used by the individual abuser."

209. A *market area controlled substance* is any of the following: cocaine, methamphetamine, or certain schedule 1 opiates (not including fentanyl).

210. Under a plain reading of the statute, a Section 7 claim does not require a nexus between the injury and the market area controlled substance.

211. Upon information and belief, Raphalides would also engage in distributing cocaine acquired from the lab.

212. Upon information and belief, Raphalides distributed cocaine to Todd, which Todd actually used, prior to Todd's fentanyl overdose.

213. In this way, Raphalides participated in illegal marketing of a market area controlled substance used by the individual abuser.

214.   Upon information and belief, Dr. Woods participated in illegal marketing of the cocaine Todd used by manufacturing it in a manner inconsistent with state and federal regulations.

215.   Upon information and belief, the University participated in illegal marketing of the cocaine Todd used by manufacturing it in a manner inconsistent with state and federal regulations.

### REQUEST FOR RELIEF

216.   Heather Kerchen, on behalf of the Estate of Todd Kerchen, requests that the defendants be held jointly and severally liable for compensatory and punitive/exemplary damages in the amount of $300,000,000.00, plus attorney and expert's fees.

### DEMAND FOR JURY TRIAL

217.   Plaintiffs demand a jury trial on all issues raised in this complaint.

October 17, 2022                                    /s/ Dustyn K. Coontz
                                                   Attorney for Plaintiffs
                                                   1100 W. Saginaw St.
                                                   Suite 4A

Lansing, MI 48915

dc@coontzlaw.com

(517) 940-8004