# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: May 06, 2024

Ms. Kyla L Barranco
Office of the Attorney General
of Michigan
P.O. Box 30754
Lansing, MI 48909

Mr. Dustyn K. Coontz
Coontz Law
500 E. Michigan Avenue
Suite 130
Lansing, MI 48915

Mr. Lawrence T. Garcia
Ms. Sydney G. Rohlicek
Mr. Brian M. Schwartz
Miller Canfield
150 W. Jefferson Avenue
Suite 2500
Detroit, MI 48226

Mr. William Bernard Norman
Norman Law
115 Lincoln Avenue
Berea, OH 44017

　　　　Re:　Case No. 23-1718, *Heather Kerchen, et al v. University of Michigan, et al*
　　　　　　　Originating Case No. : 4:22-cv-12492

Dear Counsel,

　　The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                   Yours very truly,


                                   Kelly L. Stephens, Clerk



                                   Cathryn Lovely
                                   Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

HEATHER KERCHEN; LORI KERCHEN; DALE KERCHEN,
　　　　　　　　　　　　　*Plaintiffs-Appellees*,

　　*v.*

UNIVERSITY OF MICHIGAN; JAMES H. WOODS,
　　　　　　　　　　　　　*Defendants-Appellants*,

CHRISTIAN RAPHALIDES; [UNKNOWN] DOES,
　　　　　　　　　　　　　*Defendants*.

No. 23-1718

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:22-cv-12492—Shalina D. Kumar, District Judge.

Argued: March 19, 2024

Decided and Filed: May 6, 2024

Before: COLE, CLAY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brian M. Schwartz, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellants. Dustyn K. Coontz, COONTZ LAW, Lansing, Michigan, for Appellees. **ON BRIEF:** Brian M. Schwartz, Lawrence T. Garcia, Sydney G. Rohlicek, MILLER CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellants. Dustyn K. Coontz, COONTZ LAW, Lansing, Michigan, William B. Norman, DEFENDING OHIO, Berea, Ohio, for Appellees. Kyla L. Barranco. OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Amicus Curiae.

---

### OPINION

---

CLAY, Circuit Judge.   Plaintiffs Heather, Lori, and Dale Kerchen filed a complaint against Defendants the University of Michigan and Dr. James Woods, alleging violations under 42 U.S.C. § 1983 and Michigan state law.  Defendants appeal the district court's order denying their motion to dismiss without prejudice and ordering limited discovery on whether this action is barred by the statutes of limitations applicable to Plaintiffs' claims.  For the reasons stated below, we **REVERSE** the district court's denial of Defendants' motion to dismiss, **DISMISS** various claims for lack of jurisdiction as specified below, and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

On January 25, 2000, police found Todd Kerchen ("Todd")[1] dead in his home.  The night before Todd's death, he and his girlfriend had snorted a white powder, which Todd's girlfriend in later interviews referred to as either "Crystal China," "White China," or "China White." Compl., R. 1, Page ID #6, 10–11.  Todd's autopsy revealed that he had ingested a lethal dose of fentanyl the night he died.

The Washtenaw County Sheriff's Department ("WCSD") investigated Todd's death. Todd's girlfriend told WCSD detectives that Todd had likely gotten the drugs that he used the night he died from Christian Raphalides.  The complaint alleges that Raphalides provided the same "China White" drug to a student at the University of Michigan in September 1998, more than a year before Todd's death.  That student also died from an overdose, although the police investigating the student's death reported that he had overdosed on cocaine, not fentanyl.

---

[1] To avoid confusion with Plaintiffs, who are Todd Kerchen's family members, we will refer to him as "Todd."

Although the City of Ann Arbor Police Department investigated Raphalides in connection with this earlier death, the Washtenaw prosecutors declined to charge Raphalides.

The complaint alleges that Raphalides obtained the fentanyl that killed Todd from a University of Michigan pharmacology lab where Raphalides worked until November 1999. This lab tested the effects of controlled substances on animals. At the lab, Raphalides had access to multiple controlled substances, including fentanyl in powder form. Throughout Raphalides' employment, Defendant Dr. James Woods led and oversaw the lab.

WCSD detectives interviewed Woods twice in connection with the investigation into Todd's death. In those interviews, Woods gave the detectives a detailed account of how the lab distributed and monitored the controlled substances it used. The lab kept thousands of different types of controlled substances on hand. These substances were kept in a locked safe for 22 hours each day. For two hours a day—one hour in the morning and one hour in the afternoon—employees could remove the drugs they needed for their work from the unlocked safe. Employees weighed the amount of drugs that they needed and wrote down the type and quantity of the drugs that they removed. "Ordinarily," Woods or his assistant would oversee these hour-long processes, "[b]ut not always." *Id.* at Page ID #20.

In interviews with WCSD detectives concerning Todd's death, Woods acknowledged that it would be "common" for employees to keep controlled substances in their lockers at the lab. *Id.* Indeed, Woods led the detectives to Raphalides' locker, where they discovered 28 vials of PCP, morphine, and other drugs. No one had opened the locker since Raphalides left the lab almost four months earlier. The complaint also describes certain policies that the lab failed to implement to safely manage the distribution of controlled substances. For example, the complaint alleges that the lab did not take a regular inventory of the drugs removed from the safe, and did not have a procedure in place to reconcile the amount of drugs removed from the safe with the type and quantity of drugs used in procedures in the lab.

The complaint further alleges multiple facts supporting the conclusion that the fentanyl that killed Todd came from the University of Michigan lab. For example, it alleges that the glass vial containing white powder found on Todd's coffee table after his death resembled the glass

vials containing drugs used by the lab. Specifically, all the vials had a rubber stopper with an aluminum clasp over the stopper. When WCSD detectives showed Woods a photo of the glass vial found on Todd's coffee table, he confirmed that the vial was "exactly" the same as one they would use in the lab. *Id.* at Page ID #18.

To be sure, Woods also told the detectives that these types of glass vials would be common in any research lab. However, the complaint alleges that specific labeling on the vial found at Todd's home further indicated that the fentanyl that killed him came from the University of Michigan lab. The lab employed a unique labeling procedure whereby employees would write the drug name, the date it was logged out of the safe, and the employee's initials on the aluminum clasp. The clasp found at Todd's home listed the date "6-2-94," the abbreviation "Fent. 100.56mg," and the initials "DJ." *Id.* at Page ID #21. Woods told the detectives that the initials "DJ" belonged to David Jewett, a former employee of the lab who supervised Raphalides. *Id.* According to the lab's logs, on June 2, 1994—the date listed on the vial found in Todd's home—Jewett logged out 100.4 milligrams of fentanyl.[2] Woods also confirmed that the fentanyl found in Todd's home had the same molecular structure as the fentanyl used in the lab.

The complaint alleges that the investigation into Todd's death stalled after WCSD detectives' second interview with Woods. Although the detectives attempted to contact Raphalides, they were unable to locate him. The detectives never informed the Kerchen family about their conversations with Woods, or the facts that indicated that the fentanyl that killed Todd could have originated from the University of Michigan lab. Heather Kerchen, Todd's sister, discovered the connection between the University lab and the investigation into Todd's death only after independently investigating Todd's death herself. She did not receive documents detailing the detectives' conversations with Woods until October 19, 2020.

### B. Procedural History

Based on the facts above, Plaintiffs filed a complaint on October 17, 2022 against Raphalides, the University, Woods, and other unknown Defendants, listed as "Unknown Does."

---

[2]This is 0.16 milligrams fewer than the amount listed on the vial found in Todd's home; but, as the complaint alleges, the lab had no procedure in place to ensure that the amount of drugs withdrawn from the safe matched the amount logged.

Compl., R. 1, Page ID #1.  Plaintiffs sued both Raphalides and Woods in their individual and official capacities.[3]  Plaintiffs alleged six independent counts against all Defendants.  First, they asserted a Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983, alleging that the Defendants deprived Todd of his life.  They alleged that the University and Woods' lax policies surrounding the use of controlled substances in the lab and Raphalides' exploitation of these lax policies "shocked the conscience."  Compl., R. 1, Page ID #29.  Second, Plaintiffs asserted a wrongful death claim under Michigan state law against all Defendants. *See* M.C.L. § 600.2922.  Finally, Plaintiffs asserted multiple counts under Michigan's Drug Dealer Liability Act ("DDLA"), which creates a civil cause of action for injuries caused by illegal drug use.  *See* M.C.L. § 691.1601(2).

The University and Woods moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  They primarily argued that all claims against them were barred by the statutes of limitations because Todd died more than twenty years before Plaintiffs filed their complaint.  They further argued that the complaint had not sufficiently alleged any fraudulent concealment of facts by Defendants that may permit equitable tolling of the statutes of limitations.  Defendants also contended that they were immune from suit under certain claims based on various theories of immunity.  Specifically, they argued that the University and Woods in his official capacity were entitled to sovereign immunity for all claims, and that Woods in his individual capacity was entitled to qualified immunity for Plaintiffs' § 1983 claims and governmental immunity for Plaintiffs' state law wrongful death claim.  Finally, they argued that Plaintiffs had failed to state a claim for relief under the Michigan DDLA.

In supplemental briefing supporting their motion to dismiss, Defendants presented a second ground to dismiss the state law claims asserted against the University and Woods in his official capacity.  They argued that Plaintiffs' failure to give notice to the state of Michigan before filing suit required dismissal of these claims.  Michigan law requires a party bringing a personal injury claim against the state to provide notice of the suit within six months of the

---

[3]Although a summons has been issued for Raphalides, he has not appeared in this lawsuit, and he is not a party to this appeal.

action's accrual. *See* M.C.L. § 600.6431(1), (4). Previously, a panel of the Michigan Court of Appeals held that this statutory notice requirement only applied to cases brought against the state in the Michigan Court of Claims. *See Tyrrell v. Univ. of Mich.*, 966 N.W.2d 219, 228 (Mich. Ct. App. 2020). In two cases decided after Defendants filed their motion to dismiss, however, the Michigan Supreme Court held that this notice requirement applied to all cases brought against the state, which Defendants argued included cases brought in federal court. *See Christie v. Wayne State Univ.*, 993 N.W.2d 203, 209 (Mich. 2023); *Elia Cos. v. Univ. of Mich. Regents*, 993 N.W.2d 392, 395 (Mich. 2023).

The district court declined to dismiss Plaintiffs' state law claims asserted against the University and Woods in his official capacity for failure to comply with the statutory notice requirement. It reasoned that the two new cases decided by the Michigan Supreme Court did not retroactively bar lawsuits filed before the cases were decided. The district court also ordered limited discovery on whether Defendants fraudulently concealed information from Plaintiffs such that Plaintiffs could benefit from equitable tolling. The district court otherwise denied the motion to dismiss without prejudice and did not rule on any other arguments raised by Defendants in their motion to dismiss, including Defendants' immunity arguments. Defendants timely filed an interlocutory appeal from the district court's denial of the motion to dismiss.

## II. DISCUSSION

### A. Jurisdiction

We may only review "final decisions" from district courts, which generally do not include the decision to deny a motion to dismiss. 28 U.S.C. § 1291. Nevertheless, a denial of sovereign or qualified immunity that turns purely on issues of law is a collateral order that constitutes an appealable "final decision." *Mitchell v. Forsyth*, 472 U.S. 511, 525, 530 (1985); *see also P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993). A denial of immunity at the motion to dismiss stage presents a pure question of law. *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).

In this case, although the district court did not address the merits of Defendants' sovereign or qualified immunity defenses, its decision to deny the motion to dismiss and order

subsequent discovery constitutes a collateral order over which this Court has jurisdiction. *See Skousen v. Brighton High Sch.*, 305 F.3d 520, 525–26 (6th Cir. 2002) (finding jurisdiction to review denial of qualified immunity when district court denied a motion for summary judgment without prejudice and ordered discovery); *Summers v. Leis*, 368 F.3d 881, 886–87 (6th Cir. 2004) (same); *see also Smith v. Leis*, 407 F. App'x 918, 926 n.6 (6th Cir. 2011) (applying the same logic to sovereign immunity).

Although we have jurisdiction to review Defendants' arguments that they are entitled to sovereign and qualified immunity, our jurisdiction to review the other issues raised in this appeal is less clear. Defendants ask us to exercise pendent appellate jurisdiction over three other issues, namely: (1) whether Michigan governmental immunity requires dismissal of Plaintiffs' state law wrongful death claim against Woods in his individual capacity; (2) whether Michigan's statutory notice requirement requires dismissal of all state law claims against the University and Woods in his official capacity; and (3) whether all claims are time barred by the respective statutes of limitations.

In its discretion, this Court may exercise pendent jurisdiction over claims that are "inextricably intertwined" with matters over which the Court has appellate jurisdiction. *Williams v. Maurer*, 9 F.4th 416, 428 (6th Cir. 2021) (citation omitted). Issues in an appeal "are not 'inextricably intertwined' merely because they 'overlap in some respects.'" *Id.* at 429 (quoting *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003)). Instead, pendent jurisdiction is proper only "when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Crockett*, 316 F.3d at 579 (emphasis in original) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 930 (10th Cir. 1995)). "The 'inextricably intertwined' requirement of pendent appellate jurisdiction is not meant to be loosely applied as a matter of discretion." *Chambers v. Ohio Dep't of Hum. Servs.*, 145 F.3d 793, 797 (6th Cir. 1998). Rather, the discretion granted to this Court in exercising pendent jurisdiction is the ability to decline to hear claims even when they are inextricably intertwined with appealable issues. *Archie v. Lanier*, 95 F.3d 438, 443 (6th Cir. 1996).

Plaintiffs do not oppose Defendants' jurisdictional arguments. But we have an independent obligation to assure ourselves of our own jurisdiction. *See Bonner v. Perry*, 564

F.3d 424, 426 (6th Cir. 2009).  Defendants are correct that we have jurisdiction over their claim of governmental immunity and over Defendants' statutory notice arguments, although not under the doctrine of pendent appellate jurisdiction as neither presents an issue "inextricably intertwined" with Defendants' federal immunity arguments.  *Williams*, 9 F.4th at 428.  Instead, for the reasons discussed below, we have independent jurisdiction to review the district court's decision on these claims as denials of immunity under Michigan law.  Defendants are incorrect that we may exercise pendent jurisdiction over their statutes of limitations arguments.

Defendants claim that Woods in his individual capacity is entitled to governmental immunity under M.C.L. § 691.1407.  We have held that a denial of governmental immunity under M.C.L. § 691.1407 is immediately appealable as a final order.  *See Smith v. County of Lenawee*, 600 F.3d 686, 689 (6th Cir. 2010).  Accordingly, we have jurisdiction to review this claim because, in denying the motion to dismiss, which raised Woods' entitlement to governmental immunity, the district court implicitly denied Woods this immunity.

For similar reasons, we also have jurisdiction over Defendants' arguments that Plaintiffs failed to comply with the statutory notice requirements set forth in M.C.L. § 600.6431.  The Michigan Supreme Court has held that the failure to comply with the statutory notice provision means that a state agency, such as the University of Michigan, or a state employee, such as Woods, remains entitled to governmental immunity.  *See Fairley v. Dep't of Corr.*, 871 N.W.2d 129, 133 (Mich. 2015).  And we have long held that we have jurisdiction to review the denial of Michigan governmental immunity.  *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007).  Because, if applicable, Plaintiffs' failure to comply with the statutory notice requirement would mean that the University and Woods in his official capacity are entitled to governmental immunity, we have jurisdiction to review the district court's denial of the motion to dismiss on this ground.

We do not, however, have jurisdiction to review Defendants' statutes of limitations arguments because they are not inextricably intertwined with the reviewable issues on appeal.  The parties dispute whether Plaintiffs are entitled to equitable tolling of the statutes of limitations.  Their arguments focus on whether Plaintiffs have sufficiently pleaded that any Defendants fraudulently concealed information from Plaintiffs.  This dispute has no conceivable

overlap with the properly reviewable issues on appeal, and we do not have pendent jurisdiction over these claims.

Defendants do not meaningfully argue that the statutes of limitations arguments have any relationship to the reviewable issues on appeal. Instead, they—and Plaintiffs—emphasize that we should exercise pendent jurisdiction for the sake of judicial economy. Defendants cite to one case from this Court, which, when exercising pendent jurisdiction, stated that "judicial economy would counsel hearing these two issues together." *O'Bryan v. Holy See*, 556 F.3d 361, 377 n.7 (6th Cir. 2009). But in that case, the Court chose to exercise pendent jurisdiction over an issue on which the reviewable issue "hinge[d]." *Id.* It did not extend the doctrine of pendent jurisdiction to permit this Court to hear claims primarily in the interest of judicial economy. Because Defendants' arguments relating to the statutes of limitations are not inextricably intertwined with reviewable issues, we may not consider them in this appeal.

### B. Standard of Review

This Court reviews a district court's denial of a motion to dismiss *de novo*. *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). "In reviewing the motion to dismiss, we construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

### C. Federal Claims

On appeal, Defendants argue that the district court erred in denying sovereign immunity to the University and Woods in his official capacity, and qualified immunity to Woods in his individual capacity. As an initial matter, the district court should have ruled on Defendants' immunity defenses before ordering discovery. The district court relied on this Court's decision in *Nair v. Oakland County Community Mental Health Authority* to defer ruling on Defendants' sovereign immunity arguments until after limited discovery, but this reliance was misplaced. 443 F.3d 469, 476 (6th Cir. 2006). *Nair* did not hold that a district court could avoid ruling on a sovereign immunity defense and proceed to order discovery. Instead, it held that a district court could choose to dismiss a case based on the merits if the defendants present sovereign immunity

as an alternative argument and if the merits present a more expeditious method for dismissing the case entirely. *Id.* at 476–77.

For *Nair* to hold otherwise would contradict the multiple other times that this Court has treated sovereign immunity as a jurisdictional issue. *See, e.g.*, *Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417, 425 (6th Cir. 2016). It would also contradict the longstanding principle that sovereign immunity protects a state's dignity interests in avoiding not just ultimate liability, but litigating a suit itself. *See P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 145; *see also Kelly v. Great Seneca Fin. Corp.*, 447 F.3d 944, 949 (6th Cir. 2006) ("[R]equiring a State to appear in federal court and undergo trial when it is entitled to sovereign immunity (even if it is later shielded on the merits) harms the State's dignitary interests."). A state loses the "fundamental" protection offered by the Eleventh Amendment at each step that litigation proceeds without deciding whether a state is entitled to sovereign immunity. *P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 145. To vindicate states' dignity interests implicated by their sovereign immunity to suit, district courts must issue a ruling on properly raised sovereign immunity defenses—even if raised as an alternative defense—before permitting litigation to proceed.

The district court also deferred its ruling on qualified immunity. It found that qualified immunity does not affect the district court's subject matter jurisdiction, and that it could therefore defer ruling on this defense as well. However, this Court has long held that district courts may not avoid ruling on the merits of a qualified immunity defense and permit litigation to proceed further. *See Skousen*, 305 F.3d at 527; *see also Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022). Similar to sovereign immunity, a decision on qualified immunity at the earliest possible stage of litigation is necessary to vindicate its protection against litigation itself. *See Skousen*, 305 F.3d at 526–27. Thus, the district court also erred in failing to address Defendants' qualified immunity defense before ordering limited discovery. Upon an independent review of the record, however, we find that the University and Woods in his official capacity are entitled to sovereign immunity, and that Woods in his individual capacity is entitled to qualified immunity.

### 1. Sovereign Immunity

Defendants argue that Eleventh Amendment sovereign immunity requires dismissal of all claims made against the University of Michigan and Woods in his official capacity. The Eleventh Amendment states that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. This forbids a plaintiff from suing a state, a state agent, or a state instrumentality for monetary damages in federal court unless that state has consented to suit, or unless Congress has clearly and expressly abrogated the state's immunity to suit. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120–21 (1984); *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016).

Plaintiffs only seek monetary damages from Defendants, implicating the Eleventh Amendment's bar to suit. The University of Michigan is a state agency entitled to claim Eleventh Amendment immunity. *See Ashford v. Univ. of Mich.*, 89 F.4th 960, 969 (6th Cir. 2024). And as an employee of the University, all claims against Woods in his official capacity are construed as asserted against Michigan itself. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Moreover, Congress has not abrogated Michigan's immunity to suit under § 1983 claims. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979). Thus, unless Michigan consented to suit in federal court in this matter or on these claims, the University and Woods in his official capacity are entitled to sovereign immunity.

On appeal, Plaintiffs only argue that Michigan has waived its sovereign immunity in this litigation because the University has chosen to represent Woods in his individual capacity. Plaintiffs' admittedly "novel" argument is that this Court should infer that the Eleventh Amendment permits this type of waiver based on a Supreme Court case addressing an Indian tribe's sovereign immunity. Pl.'s Br., ECF No. 24, 22. Specifically, in *Lewis v. Clarke*, the Supreme Court considered whether an individual sued in his personal capacity could benefit from his tribe's sovereign immunity because the tribe was required by law to indemnify him for the accident at issue. 581 U.S. 155, 157–58, 160 (2017). The Court found that this relationship

did not transform the suit against him in his individual capacity into one against the tribe because "[t]he critical inquiry is who may be legally bound by the court's adverse judgment, not who will ultimately pick up the tab." *Id.* at 165.

Plaintiffs argue that this Court should make a logical leap from *Lewis*'s holding to find that Michigan has waived its sovereign immunity in this case. *Lewis* held that a tribe's mandated indemnification of an individual did not mean that the individual could benefit from tribal immunity. Plaintiffs argue that, in this case, *Lewis* means that Michigan's representation of Woods in his individual capacity means that Michigan cannot benefit from sovereign immunity. In essence, Plaintiffs take from *Lewis* the rule, "if indemnification, then no immunity," and ask the Court to apply this rule to this case. Not only is this an unsupported logical jump from *Lewis*'s holding, but it is contradicted by *Lewis* itself. *Lewis* found that the defendant could not benefit from tribal immunity because it would ultimately be the individual defendant, not the tribe, held legally responsible if plaintiffs were successful in their suit. *Id.* By contrast, in this case, if Plaintiffs are successful in the merits of their claims against the University and Woods in his official capacity, Michigan will be held responsible and "legally bound by the . . . judgment," squarely implicating the core protection of sovereign immunity.**4** *Id.*

Moreover, Michigan has not waived its sovereign immunity through its other conduct in this litigation. A state may waive its sovereign immunity through litigation conduct, but its intent to do so must be "clear." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002). Michigan has made no such clear indication; to the contrary, it has only filed a motion to dismiss, which explicitly raised sovereign immunity as a defense. This alone is enough to find that Michigan did not waive its sovereign immunity defense. *See Puckett*, 833 F.3d at 598 n.1 ("The Commonwealth did not file an answer but rather raised the immunity defense in its motion to dismiss. That was sufficient to defeat any argument that the immunity issue had been waived.").

---

**4**Plaintiffs' argument has a second flaw: Michigan has not indicated that it will *indemnify* Woods in his individual capacity. It has only chosen to provide him with representation by the same attorneys who represent the University and Woods in his official capacity.

Plaintiffs only request monetary damages, and the University and Woods in his official capacity are treated as the State of Michigan for purposes of this litigation. Moreover, contrary to Plaintiffs' attempt to show otherwise, Michigan has not waived its sovereign immunity in this litigation either by representing Woods in his individual capacity or by any other litigation conduct. Therefore, all claims against the University and Woods in his official capacity are barred by Eleventh Amendment sovereign immunity.

### 2. Qualified Immunity

Defendants also argue that qualified immunity bars Plaintiffs' substantive due process claim under § 1983 against Woods in his individual capacity. Qualified immunity immunizes government officials from suit to the extent that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs bear the burden of showing that a government official is not entitled to qualified immunity. *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019). At the motion to dismiss stage, this means that a plaintiff must plausibly allege facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). Although qualified immunity may generally be better resolved on a motion for summary judgment rather than a motion to dismiss, a plaintiff must still sufficiently plead facts to show a clearly established constitutional violation. *See Myers*, 41 F.4th at 758–59.

The Due Process Clause of the Fourteenth Amendment protects citizens from government deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As opposed to procedural due process, "[s]ubstantive due process is '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (second alteration in original) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). Substantive due process prohibits behavior from state actors that "shock[s] the conscience" and protects those "interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003) (citations omitted). It also protects

individuals against deprivations based on "arbitrary and capricious" action, "another formulation" of the "shocks the conscience" standard. *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003).

Plaintiffs allege that Woods engaged in conscience-shocking behavior by overseeing and implementing the University lab's "lax policies surrounding lethal controlled substances," and that this lax administration deprived Todd of his life. Compl., R. 1, Page ID #32. Plaintiffs have plausibly pleaded the deprivation of a protectable interest under the Constitution, as Todd's death plainly constitutes a deprivation of life. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006). The central question, therefore, is whether Woods' alleged role in this deprivation amounted to conscience-shocking behavior.

The principles enumerated in *Rochin v. California*, 342 U.S. 165 (1952) provide the "benchmark" for what shocks the conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). In *Rochin*, police pumped a suspect's stomach to obtain pills as evidence for prosecution. *Rochin*, 342 U.S. at 166. The Supreme Court found that this behavior "shock[ed] the conscience" because it was "so brutal and so offensive to human dignity" that it violated the "decencies of civilized conduct," and, thus, violated the Constitution. *Id.* at 172–74. These are no doubt largely subjective standards that amount to "no calibrated yard stick." *Lewis*, 523 U.S. at 847. At base, however, courts have emphasized that the "shocks the conscience" standard does not impose constitutional liability on all state actors who simply cause harm, nor does it "purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986); *see also Lewis*, 523 U.S. at 848. Instead, it "sets a high bar" and only penalizes government actions that offend "traditional ideas of fair play and decency" such that they violate the Constitution. *Range*, 763 F.3d at 589–90 (citation omitted).

In an effort to map on some commonly understood principles to this "more fluid" constitutional doctrine, the Supreme Court has analogized potentially conscience-shocking behaviors to the standards governing generalized tort law. *Lewis*, 523 U.S. at 848–50 (citation omitted). Governmental behavior is "most likely to rise to the conscience-shocking level" when it is "intended to injure in some way unjustifiable by any government interest." *Id.* at 849. By

contrast, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id.* "[C]loser calls" are presented by middle-of-the-spectrum culpability levels, such as recklessness or gross negligence. *Id.* Deliberate indifference can also form the basis for a "shocks the conscience" claim. *Id.* at 850. Actions taken in these middle stages of culpability "may or may not be shocking depending on context." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008).

Plaintiffs admit that Woods did not take intentional action to cause Todd's death. Instead, they argue that his laxity in ensuring the proper distribution of controlled substances in the lab was reckless and deliberately indifferent to the harm that this lack of supervision may cause. Thus, the only way that Plaintiffs may prevail on their due process claim is to allege sufficient facts to show that Woods' administration of the lab was so deliberately indifferent or reckless that it shocked the conscience.

"Deliberate indifference in the constitutional sense requires that the officials knew of facts from which they could infer a 'substantial risk of serious harm,'" and "that they did infer it." *Range*, 763 F.3d at 591 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 513 (6th Cir. 2002)). It then requires the officials to have "act[ed] or fail[ed] to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights." *Ewolski*, 287 F.3d at 513 (citation omitted). In the substantive due process context, we have treated the deliberate indifference analysis as akin to subjective recklessness. *See Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003).

To sufficiently allege that Woods inferred a "substantial risk of serious harm," Plaintiffs must allege that Woods knew both the "scope and substance" of the particular risk of harm at issue. *Range*, 763 F.3d at 591 (citation omitted). This Court has repeatedly declined to define the type of risk potentially contemplated by defendants at too high a level of generality. *See, e.g.*, *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020) ("[A] public official must know of more than a *general* risk of harm. The official must know of the *specific* risk that later develops." (emphasis in original)). For example, in *Range*, this Court found that the supervisors of a county morgue employee who sexually abused corpses were not deliberately indifferent in their supervision of the employee because they had no knowledge of

the specific risk the employee posed. *Range*, 763 F.3d at 578–79, 591. Although the supervisors knew that the employee was drinking and having sex with live women at the morgue, this Court found that there was no evidence that the knowledge of these facts could indicate that the defendants knew of the substantial risk that the employee would then sexually abuse corpses. *Id.*

Similarly, in *McQueen*, after one student killed his classmate, the Court declined to impose due process liability on the teacher who left the students in the classroom together. 433 F.3d at 462–63, 469–70. Although the teacher had known that the student who killed his classmate had previously attacked other classmates with a pencil, this Court found that this previous behavior did not show that the teacher had a subjective knowledge of the risk that the student would use a gun to kill his classmate. *Id.* at 469–70; *see also Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d at 935 (finding that a teacher could not subjectively know that student who had lit matches on the bus was at risk of sexually assaulting another student).

In this case, the complaint alleges that the lab had procedures in place to restrict employees' access to the many controlled substances present in the lab. Thus, the complaint plausibly indicates that Woods, by implementing these procedures, knew that the unauthorized and unrestricted access to controlled substances could pose *some* risk, and that this risk could include these substances being abused. The complaint, however, does not allege that Woods had any knowledge that would lead him to believe that one of his employees intended to remove some of the controlled substances from the lab to distribute to the wider community. Although it alleges that, in September 1998, Raphalides provided "China White" to another individual, it does not allege that Raphalides obtained this drug from the lab. Compl., R. 1, Page ID #14. More importantly, it does not allege that Woods had any knowledge of this overdose or Raphalides' alleged involvement with it. Because the complaint does not plausibly allege that Woods had knowledge of the risk that Raphalides would remove drugs from the lab, it has not sufficiently pleaded a violation of substantive due process.

Even if the risk known by Woods could be defined at a higher level of generality, such as the risk that any lab employee could remove drugs from the lab to distribute in the community, Woods' actions do not amount to conscience-shocking behavior. The complaint alleges that the following actions or omissions by Woods shocked the conscience. First, during the twice-daily,

one-hour blocks in which Woods opened the safe containing the controlled substances, Woods or his assistant "[o]rdinarily" would oversee the distribution of controlled substances, "[b]ut not always." Compl., R. 1, Page ID #20.  Outside of this occasional lapse in policy, the complaint more generally alleges that the lab did not affirmatively take other actions to properly ensure the safe distribution of the controlled substances in the lab.**5**

In all, Plaintiffs allege that Woods did not "always" follow the lab's plan to ensure a safe distribution of the drugs, and that he did not implement any additional procedures to ensure the drugs remained in the lab.  *Id.*  This behavior sounds in negligence, rather than the type of "callous disregard for the safety" of the community that we have held is necessary to show a due process violation.  *Ewolski*, 287 F.3d at 514; *see also Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d at 936 ("At most, however, the failure to take these additional precautions suggests negligence, which falls well short of establishing the required 'callous disregard for the safety' of Minor Doe." (citation omitted)).  Thus, because the complaint does not plausibly allege either that Woods knew of the substantial risk that Raphalides would take drugs out of the lab, or that Woods' actions amounted to conscience-shocking behavior, Plaintiffs have failed to plausibly allege that Woods violated Todd's substantive due process rights.  Accordingly, Woods is entitled to qualified immunity.

### D.  State Claims

Defendants raise three other issues on appeal that concern Michigan law.  First, the parties debate whether Plaintiffs' claims are barred by the relative statutes of limitations, as defined by Michigan law, and specifically whether Plaintiffs have adequately pleaded facts that could permit Plaintiffs to evade the statutes of limitations for their claims based on a theory of fraudulent concealment.  As stated, we do not have jurisdiction to review the parties' arguments relating to fraudulent concealment and its impact on the statutes of limitations.

Second, the parties spend a significant portion of their briefs discussing whether Plaintiffs' claims are barred by Michigan's statutory notice provision that requires a plaintiff

---

**5**For example, the complaint alleges that there were no procedures employed to reconcile the amount of drugs taken from the safe with those used in the lab, and no regular inventorying of the drugs that had been removed from the safe.  Further, there were no procedures in place to ensure that the drugs remained in the lab.

suing the state to give notice within a certain period of time before filing suit. Defendants, however, concede that even if we were to agree with their arguments on this point, this would only require dismissal of the state law claims against the University and Woods in his official capacity. Because the state law claims against these Defendants are barred by sovereign immunity just as the federal claims are barred, *Pennhurst*, 465 U.S. at 120–21, we need not decide whether Plaintiffs' admitted failure to comply with this statutory notice provision also bars these claims.

Finally, Defendants argue that Woods in his individual capacity is entitled to governmental immunity under Michigan law for Plaintiffs' wrongful death claim. But Plaintiffs have failed to address this argument in their appellate briefing, and have therefore abandoned appellate review of any arguments they may have had in response. *See Puckett*, 833 F.3d at 610–11. Even if Plaintiffs had not abandoned their arguments on this claim, however, we would find that Woods is entitled to governmental immunity. Michigan law immunizes a government employee from tort liability when that employee performs a governmental function within the scope of his authority and when his "conduct does not amount to gross negligence that is the proximate cause of the injury or damage." M.C.L. § 691.1407(2)(c). Defendants argue that because Plaintiffs have not alleged facts showing that Woods was either grossly negligent or the proximate cause of Todd's death, Woods is entitled to governmental immunity under M.C.L. § 691.1407.

Michigan's standard of gross negligence is slightly lower than the federal Constitution's standard for deliberate indifference, and, thus, the analysis of Woods' culpability as to the § 1983 substantive due process claim does not apply with equal force. *See Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012). Regardless of whether Woods' conduct reached this lower level of culpability, Defendants are correct that the complaint does not plausibly allege that Woods' actions were "the proximate cause" of Todd's death as that phrase has been understood by Michigan courts. The Michigan Supreme Court has interpreted the use of the article "the" preceding "proximate cause" in M.C.L. § 691.1407(2)(c) to mean that a defendant's actions must be "the one most immediate, efficient, and direct cause of the injury or damage, i.e., *the*

proximate cause." *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000) (emphasis added).

In this case, Raphalides' choice to remove the fentanyl from the lab, even if it was not the most direct cause of Todd's death, was a sufficient intervening cause such that the "most immediate" cause of Todd's death was not Woods' administration of the lab. *See id.* at 312–13, 319 (finding that the proximate cause of the death of a driver and a passenger in cars fleeing from police were the drivers of the car, not the police); *see also Jasinski v. Tyler*, 729 F.3d 531, 537, 545 (6th Cir. 2013) (finding child protective services employees were entitled to governmental immunity under M.C.L. § 691.1407 because a father's abuse, not their lack of investigation, was the proximate cause of a child's death). Thus, even if Plaintiffs had not abandoned any arguments on this issue, Defendants are correct that Plaintiffs' wrongful death claim against Woods in his individual capacity should be dismissed as barred by governmental immunity.

## III. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's denial of Defendants' motion to dismiss and **REMAND** with instructions to:  (1) dismiss all claims against the University and Woods in his official capacity as barred by sovereign immunity; (2) dismiss the § 1983 claim against Woods in his individual capacity as barred by qualified immunity; and (3) dismiss the wrongful death claim against Woods in his individual capacity as barred by governmental immunity. We **DISMISS** the remainder of Defendants' appeal for lack of jurisdiction.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 23-1718

HEATHER KERCHEN; LORI KERCHEN; DALE
KERCHEN,

     Plaintiffs - Appellees,

     v.

UNIVERSITY OF MICHIGAN; JAMES H. WOODS,

     Defendants - Appellants,

CHRISTIAN RAPHALIDES; [UNKNOWN] DOES,

     Defendants.

> **FILED**
> May 06, 2024
> KELLY L. STEPHENS, Clerk

Before:  COLE, CLAY, and BLOOMEKATZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Flint.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Defendants' motion to dismiss is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion and instructions of this court.  IT IS FURTHER ORDERED that the remainder of Defendants' appeal is DISMISSED for lack of jurisdiction.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

Kelly L. Stephens, Clerk